**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ROBERTA LOUISE DAYKIN, | CASE NO. 1:21-CV-00679 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Roberta Louise Daykin ("Plaintiff" or "Ms. Daykin") seeks judicial review of

the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her

application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned pursuant to the

consent of the parties. (ECF Doc. 16.)   For the reasons explained herein, the Court **AFFIRMS**

the Commissioner's decision.

## I.   Procedural History

On February 21, 2019, Ms. Daykin filed an SSI application.  (Tr. 15, 75, 91, 171-76.)

She asserted a disability onset date of July 1, 2015 (Tr. 15, 74), and alleged that she was disabled

due to emphysema, spot on her lungs, back pain, scoliosis, arthritis in spine, depression, PTSD,

COPD, plate in leg, and plastic eardrum in right ear.  (Tr. 75, 93, 116, 118, 120, 123, 187).  Her

1

applications were denied at the initial level (Tr. 112-19) and upon reconsideration (Tr. 120-24).

She requested a hearing (Tr. 125), which was held before an Administrative Law Judge ("ALJ")

on May 8, 2020 (Tr. 33-73).

On May 26, 2020, the ALJ issued an unfavorable decision, finding Ms. Daykin had not

been under a disability since February 21, 2019, the date the application was filed.  (Tr. 12-32.)

Ms. Daykin requested review of the ALJ decision by the Appeals Council.  (Tr. 168-70.)   On

January 25, 2021, the Appeals Council denied her request for review, making the ALJ's decision

the final decision of the Commissioner.  (Tr. 1-6.)

## II.  Evidence

Although the ALJ identified several severe physical and mental impairments (Tr. 17),

Ms. Daykin only challenges the ALJ's decision relative to her vocal and hearing impairments.

(ECF Doc. 12, ECF Doc. 14.)  The evidence summarized herein is accordingly focused on

evidence pertaining to those impairments.

**A.    Personal, Educational, and Vocational Evidence**

Ms. Daykin was born in 1966.  (Tr. 28.)  She completed school through the eighth grade.

(Tr. 46.)  She did not have her GED and had not held a full-time job since 2005.  (*Id*.)

**B.    Medical Evidence**

**1.    Treatment History**

**i.    Vocal Impairment**

On November 10, 2018, Ms. Daykin presented to the emergency room at MetroHealth

with multiple complaints and was seen by Robert Jones, M.D.  (Tr. 279.)  She reported having a

productive cough that started one week earlier, but admitted smoking one pack a day.  (Tr. 279-

80.)  On examination, there was no evidence of respiratory distress, and her speech was normal.

(*Id.*)  Based on her cough, examination, and history of extensive smoking, Dr. Jones suspected COPD.  (Tr. 281.)  He prescribed an inhaler and counseled her against smoking.  (Tr. 281.)  Her chest x-ray was negative.  (*Id.*)

On November 26, 2018, Ms. Daykin saw Jacqueline Severt, M.D. in the internal medicine department at MetroHealth to establish a new primary care provider.  (Tr. 276.)  She reported changes to her voice and hoarseness.  (Tr. 276, 278.)  Dr. Severt recommended that she see an ENT.  (Tr. 278.)

On December 28, 2018, Ms. Daykin saw ENT Harvey Tucker, M.D., regarding her hoarse voice, which she reported had been present for a year or two.  (Tr. 274.)  Dr. Tucker's examination included use of a flexible fiberoptic laryngoscopy.  (*Id.*)  He noted that Ms. Daykin's examination was difficult because she was actively coughing and her vocal folds were mobile.  (*Id.*)  He stated there appeared "to be a leukoplakic lesion on the right true focal fold anteriorly and possibly extending to the left, but no other obvious abnormalities."  (*Id.*)  He indicated that "the general symmetry of [her] larynx seem[ed] to be intact."  (*Id.*)  He ordered a videostroboscopic evaluation "to better delineate the condition of her larynx" and indicated they would determine the "appropriate management after speech pathology . . . had an opportunity to evaluate her."  (*Id.*)

On January 25, 2019, Ms. Daykin saw Sue Ann Philippbar, CCC-SLP, for a videostroboscopic voice evaluation.  (Tr. 267.)  She reported cutting back on smoking.  (*Id.*)  She described herself as "a talker" and reported that she tried to "talk loud frequently, just to get her point across."  (*Id.*)  SLP Philippbar completed a "[b]rief perceptual and acoustic assessment," and found Ms. Daykin's "vocal quality reveal[ed] moderate to severe dysphonia with a rough quality and low pitch" and "average fundamental frequency."  (*Id.*)  The videostroboscopic

assessment showed "significant bilateral vocal fold polyps on the entire surface of the vocal folds bilaterally" with apparent "secretions on the vocal folds -especially on the right." (*Id.*)  There was normal abduction/adduction of the vocal folds. (*Id.*)  SLP Philippbar felt that voice therapy was not warranted at the time, but thought it might be warranted if Ms. Daykin had vocal fold surgery. (*Id.*)  SLP Philippbar advised Ms. Daykin regarding vocal hygiene and the importance of quitting smoking, hydration, and reducing caffeine. (*Id.*)

On February 8, 2019, Ms. Daykin returned to Dr. Tucker. (Tr. 261-62.)  Dr. Tucker's review of the videostroboscopic evaluation confirmed "bilateral fusiform at the vocal polyps with little or no evidence of leukoplakia," and he felt "she would benefit from surgical correction." (Tr. 262.)  Ms. Daykin agreed to proceed with vocal fold surgery and possibly laser surgery to remove the polyps. (*Id.*)  Dr. Tucker advised Ms. Daykin that if she continued to smoke, "there was every reason to expect" reoccurrence. (*Id.*)  He also noted that she understood she would need to attend speech therapy for at least several weeks after the surgery. (*Id.*)

On March 1, 2019, Ms. Daykin underwent surgery for her vocal cord lesions. (Tr. 242-44.)  Dr. David Ludlow, M.D. performed a "suspension microlaryngoscopy with biopsies and KTP laser ablation of the vocal cords." (*Id.*)  On March 15, 2019, Ms. Daykin had a post-operative appointment with Dr. Ludlow. (Tr. 342-43.)  She reported feeling "quite hoarse" since her surgery. (Tr. 342.)  On examination, Ms. Daykin's oropharynx was clear and her vocal cords were "mostly healed" but she had "severe supraglottic squeeze with phonation." (Tr. 343.)  Dr. Ludlow recommended a CT scan to evaluate a mass on her larynx and speech therapy for her "pressed phonation." (*Id.*)

That same day, Ms. Daykin returned to SLP Philippbar. (Tr. 341.)  She reported "vocal straining" and that her voice came and went since surgery, but also stated "I don't sound like

Donald Duck anymore." (*Id*.)  She presented with "a moderate to severe strained, rough vocal quality." (*Id*.)  "Straining [was] observed [during] conversation" and "[i]ntermittent aphonic voice breaks were observed." (*Id*.)  Her "maximum phonation time" was six seconds "with severe strain at the end." (*Id*.)  SLP Philippbar was unable to detect pitch due to severe dysphonia. (*Id*.)  SLP Philippbar outlined Ms. Daykin's short- and long-term goals and felt that her prognosis relative to her goals was good.  Tr. 342.  SLP Philippbar recommended five to eight voice therapy sessions. (*Id*.)  Ms. Daykin returned to SLP Philippbar for sessions on March 27, 2019, and April 3, 2019. (Tr. 332, 336-37.)  During her April 3, 2019, session she reported that she felt like she was getting a cold but was cooperative. (Tr. 332.)

On April 9, 2019, Ms. Daykin presented for a psychological consultative examination with clinical psychologist Richard N. Davis. (Tr. 316-22.)  Dr. Davis noted that Ms. Daykin "could barely talk" and was "primarily doing a lot of squeaking because she just recently had surgery on her vocal cords." (Tr. 316.)  Ms. Daykin declined a request to postpone her evaluation to a different day when she could talk better. (*Id*.)  Dr. Davis observed that her flow of conversation was satisfactory and she "had a tendency to ramble even though she was having a difficult time talking." (Tr. 318.)  He also observed that she talked "to the point where she would start to cough and then would have to stop and have a coughing spell and then continue." (Tr. 319.) She expressed concern about not knowing whether her vocal cord and throat problems were cancer. (Tr. 320.)

On April 10, 2019, Ms. Daykin returned to Dr. Ludlow for follow up. (Tr. 330.)  She reported being sick over the past week with a cough, sinus congestion, and difficulty swallowing. (*Id*.)  On examination, Ms. Daykin's ability to communicate had improved but she still had strained phonation. (*Id*.)  Dr. Ludlow used a scope to better evaluate her symptoms, noting that

she had a strong gag reflux.  (Tr. 331.)  He was only able to get a brief glimpse, but found that

her vocal cords appeared healed and mobile.  (*Id*.)  He did not see any bulging at the site of the

biopsy of the hamartoma.  (*Id*.)  He also noted that there was no obvious mass seen in the larynx

on the CT scan.  (*Id*.)  Ms. Daykin also saw SLP Philippbar on April 10, 2019.  (Tr. 331-32.)

She reported not feeling well due to a respiratory infection.  (Tr. 331.)  They worked on some

breath techniques, but were limited because she was not feeling well.  (*Id*.)

On May 8, 2019, Ms. Daykin saw SLP Philippbar and Dr. Ludlow.  (Tr. 442-44, 444-45.)

She reported to SLP Philippbar that she was finally feeling better.  (Tr.  444.)  They worked on

"breath support when speaking" and she was "able to control her rate better."  (Tr. 445.)  Her

maximum phonation was ten seconds and she continued to be moderately dysphonic, but SLP

Philippbar noted less effort and straining.  (*Id*.)  Ms. Daykin reported to Dr. Ludlow that her

voice sounded better, but she was having trouble swallowing and a lot of discomfort in her

throat.  (Tr. 443.)  On examination, Dr. Ludlow observed that Ms. Daykin's ability to

communicate was "improved but still strained phonation and breathiness."  (*Id*.)  Her vocal cords

appeared healed and mobile.  (*Id*.)  She was diagnosed with "vocal cord polyps s/p excision, now

with muscle tension dysphonia and a benign mass of the larynx."  (*Id*.)  Dr. Ludlow

recommended that she continue with voice therapy.  (*Id*.)

On May 23, 2019, Ms. Daykin attended a physical consultative examination conducted

by Paul Schefft, M.D.  (Tr. 393-406.)  She reported struggling to get enough air to speak since

her polyp removal surgery.  (Tr. 393-94.)   On examination, her lungs were clear and there was

no shortness of breath with exertion or while lying flat.  (Tr. 395.)  Dr. Schefft diagnosed

possible emphysema along with back impairments, finding she was at least moderately impaired

in her work-related abilities.  (Tr. 396.)

On June 4, 2019, Ms. Daykin saw pulmonologist Ishan Lalani, M.D. regarding COPD. (Tr. 430-35.)  She reported a cough, occasional whitish mucoid sputum, wheezing, and dyspnea. (Tr. 431.)  She stated she could walk a half block and only do 7-8 steps due to dyspnea.  (*Id*.) She had wheezing and a hacking cough.  (*Id*.)  She reported that she stopped smoking four months earlier.  (*Id*.)  On examination, she was in no acute distress.  (Tr. 433.)  She was cooperative and "able to speak in full sentences though truncated at the end due to raspy voice and some effort related to vocal cord dysfunction."  (*Id*.)  She had good air entering bilaterally with symmetric breath sounds, no crackles or rhonchi, and occasional scattered wheezing.  (*Id*.) She was diagnosed with a chronic cough, asthma/COPD overlap syndrome, vocal cord polyps, and severe GERD. (Tr. 434.)  She was instructed to use albuterol as needed, follow up with her ENT for her vocal cord polyps and a gastroenterologist for her GERD, and to receive training on use of her inhaler.  (*Id*.)

On June 12, 2019, Ms. Daykin returned to SLP Philippbar.  (Tr. 426-27.)  She reported having COPD with on and off coughing.  (Tr. 426.)  She continued to work on "breath support when speaking" and she was "able to control her rate better with reminders."  (*Id*.)  Her maximum phonation time was twelve seconds.  (*Id*.)  There was "less effort and straining noted" but she continued to be moderately dysphonic.  (*Id*.)  SLP Philippbar recommended that Ms. Daykin continue to work at home on rate and volume control with "easy voicing," no "straining or loud voicing," and intermittent voice rest.  (Tr. 427.)  She noted that Ms. Daykin was complying "fairly well," limiting her caffeine, and was not smoking.  (*Id*.)

Pulmonary function testing on August 6, 2019 (Tr. 507-08) was "consistent with a mild obstructive ventilatory defect with a significant response to inhaled bronchodilators, with air

trapping and normal diffusing capacity" (Tr. 508).  The testing was also consistent with a diagnosis of asthma.  (*Id*.)

On October 3, 2019, Ms. Daykin saw Sharon Roesner, APRN-CNP, at MetroHealth for pharmacologic management for her anxiety and PTSD.  (Tr. 520-21.)  On mental status examination, her speech was spontaneous with a normal rate and flow.  (Tr. 522.)

On October 22, 2019, Ms. Daykin returned to Dr. Ludlow.  (Tr. 528-33.)  She reported "great improvement in her voice" and was "pleased" with how things were going.  (Tr. 528.)  She noted "occasional raspiness and hoarseness but overall [felt] she [was] doing much better." (*Id*.)  She reported no difficulty swallowing and had no other concerns.  (*Id*.)  On examination, Dr. Ludlow observed that Ms. Daykin's ability to communicate was "much improved with near normal sounding voice with only occasional voice breaks and straining."  (Tr. 529.)  Dr. Ludlow indicated that she was "doing great" and found "no additional intervention [was] needed," noting only the need for follow up in six months to make sure that there was no return or regrowth of the chondroid hamartoma.  (*Id*.)

On October 24, 2019, Ms. Daykin saw Dr. Lalani regarding her respiratory symptoms and COPD. (Tr. 535-40.)  She continued to report walking limitations due to dyspnea with wheezing and a hacking cough.  (Tr. 535.)  On examination, she was in no acute distress and "able to speak in full sentences though truncated at the end due to raspy voice and some effort related to vocal cord dysfunction" (Tr. 538.)  She had good air entering bilaterally with symmetric breath sounds, no crackles or rhonchi, and occasional scattered wheezing.  (*Id*.)  She was diagnosed with: chronic cough and wheezing due to moderate, persistent asthma exacerbated by environmental allergies; vocal cord polyp; and severe GERD.  (Tr. 440.)  Dr.

Lalani recommended use of nebulizer as needed for wheezing and shortness of breath, continued follow up with ENT for vocal cord polyp, and avoidance of allergens.  (*Id*.)

On January 2, 2020, Ms. Daykin saw Ms. Roesner for a pharmacologic management appointment.  (Tr. 559-62.)  On mental status examination, her speech was spontaneous with normal rate and flow.  (Tr. 561.)

### ii.     Hearing Impairment

During the November 26, 2018 office visit with Dr. Severt that was discussed above, Ms. Daykin reported having a "plastic eardrum to right ear."  (Tr. 277.)  During the January 25, 2019 visit with SLP Philippbar discussed above, she denied "hearing difficulties" and showed "no problem following conversational level speech."  (Tr. 267.)

During her April 9, 2019 psychological consultative evaluation with Dr. Davis, Ms. Daykin had no difficulty hearing.  (Tr. 321.)  During her May 23, 2019 consultative examination with Dr. Schefft, her hearing appeared adequate for normal conversation.  (Tr. 395.)

On January 16, 2020, Ms. Daykin presented to Nilam Patel, M.D. in the MetroHealth ENT clinic, complaining of "new onset right ear pain."  (Tr. 567.)  She reported that about a week earlier she "felt a popping sensation in her right ear and since then [had] been having a continuous 'hissing' sound from that ear."  (*Id*.)  She also reported tenderness around the ear, intermittent vertigo, and a headache.  (*Id*.)  She stated she had "a baseline hearing change and her hearing [was] not worse since the episode."  (Tr. 568.)  She reported having surgery when she was a child after a "tumor the size of golf ball" ruptured in her ear drum and a later surgery in 1999 but she had not been following with an ENT during adulthood and had no other issues with the ear.  (Tr. 568.)  She indicated she wore earplugs when showering to avoid water getting in her ears.  (*Id*.)  On examination, she was breathing comfortably but she had a "hoarse voice

9

with strain." (Tr. 568.) There was impacted wax in the right ear. (*Id*.) Otherwise, the examination findings for both ears were unremarkable. (*Id*.) An audiogram was performed, showing "[m]ixed hearing loss in the right ear with a profound conductive component." (*Id*.) There was "mild-moderate sensorineural [hearing loss] in the left ear." (*Id*.) Dr. Patel planned to soften the cerumen impaction before proceeding with imaging and he discussed the possibility of hearing amplification after they resolved her acute complaint. (Tr. 568-69.)

On January 16, 2020, Ms. Daykin also saw Madeline Merkord, Au.D., CCC-A for an audiologic evaluation. (Tr. 574.) Audiologist Merkord's testing showed "significant asymmetric hearing loss, right ear (mixed) worse than left ear (sensorineural), with symmetric bone conduction thresholds" and "[t]ympanometry [was] suggestive of abnormal middle ear function bilaterally," but "[w]ord recognition ability was good at the right ear and excellent at the left ear." (*Id*.) Audiologist Merkord indicated that Ms. Daykin's "hearing loss would affect communication in all listening situations, especially background noise" and she "may benefit from binaural digital hearing aids." (*Id*.)

On February 6, 2020, Ms. Daykin returned to Dr. Patel for follow up regarding her right ear pain. (Tr. 611.) She reported "a persistent and louder 'hissing' sound from the [right] ear" that she described as "a loud static noise, non pulsatile." (*Id*.) She also reported that she continued to have vertigo. (*Id*.) Dr. Patel removed the cerumen that day, which was severely impacted, and found that the full cavity looked healthy with no trauma or drainage. (Tr. 612.) Dr. Patel recommended that they proceed with a CT scan. (*Id*.)

On February 26, 2020, Ms. Daykin had the CT scan of her inner ears. (Tr. 616-18.) The CT scan showed "[p]ostsurgical changes of right radical mastoidectomy with minimal nonspecific soft tissue in the inferior part of the middle ear cavity," "[c]hronic sinus disease

10

without air-fluid level or bony erosion," and "[p]ostsurgical changes of the maxillary sinuses."
(Tr. 617.)

On April 21, 2020, Ms. Daykin presented to the emergency department, complaining of
bilateral ear pain after blowing her nose that morning.  (Tr. 624-27.)  She was treated by Kiara
Johnson, APRN-CNP.  (Tr. 627.)  Ms. Daykin reported having nasal congestion for a few days
but no ear pain until that morning.  (Tr. 625.)  There was a small area of scarring noted in the
right ear.  (Tr. 626.)  Otherwise, the examination of her ears was unremarkable.  (*Id*.)  CNP
Johnson concluded that Ms. Daykin's symptoms were likely viral in nature and she was provided
a refill for her Claritin and advised to try Flonase.  (*Id*.)

### 2.    Opinion Evidence

#### i.    Consultative Evaluations

As discussed above, Ms. Daykin attended a psychological consultative examination with
Dr. Davis on April 9, 2019 (Tr. 316-22), and a physical consultative examination conducted by
Paul Schefft, M.D. on May 23, 2019 (Tr. 393-406).

Dr. Davis noted Ms. Daykin she "could barely talk" and was "primarily doing a lot of
squeaking because she just recently had surgery on her vocal cords."  (Tr. 316.)  Dr. Davis
observed that her flow of conversation was satisfactory and she "had a tendency to ramble even
though she was having a difficult time talking."  (Tr. 318.)  He also observed that she talked "to
the point where she would start to cough and then would have to stop and have a coughing spell
and then continue."  (Tr. 319.)  She had no difficulty hearing but had difficultly speaking, as
noted in the report.  (Tr. 321.)

During Ms. Daykin's evaluation with Dr. Schefft, she reported struggling to get enough
air to speak since her polyp removal surgery.  (Tr. 393-94.)   On examination, her lungs were

clear and there was no shortness of breath with exertion or while lying flat.  (Tr. 395.)  Her hearing appeared adequate for normal conversation.  (*Id.*)

### ii.        State Agency Reviewing Consultants

An initial review of Ms. Daykin's claim was conducted by state agency reviewing medical consultant Angela Bucci, D.O. on June 10, 2019 (Tr. 83-86) and state agency reviewing psychological consultant Irma Johnston, Psy. D. on May 5, 2019 (Tr. 86-88).  In her physical RFC assessment, Dr. Bucci found that Ms. Daykin could perform light work with: occasional use of foot controls with the left lower extremity; no climbing ladders, ropes, or scaffolds; occasional balancing; frequent climbing ramps and stairs; frequent stooping; avoidance of all exposure to vibration and hazards; and avoidance of even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. 84-85.)   In her mental RFC assessment, Dr. Johnston found that Ms. Daykin was moderately limited in certain areas but she could: understand and remember short, repetitive tasks; perform short and occasional multi-step tasks in a setting with flexible pace and production requirements; engage in superficial contact with others in the work-setting; and adapt to infrequent changes in routine.  (Tr. 86-88.)

On reconsideration, state agency reviewing medical consultant Steve McKee, M.D. affirmed Dr. Bucci's physical RFC findings on August 18, 2019 (Tr. 100-02) and state agency reviewing psychological consultant Paul Tangeman, Ph.D. affirmed Dr. Johnston's mental RFC findings on August 17, 2019 (Tr. 102-04).

### C.       Hearing Testimony

### 1.       Plaintiff's Testimony

Ms. Daykin testified at the May 8, 2020 telephonic hearing in response to questioning by the ALJ and her representative.  (Tr. 43-66.)  When asked what prevented her from working, Ms.

Daykin stated: "My back, my feet.  And then I can't stand very long, I can't walk very long.  I can't even lift my 20-pound niece."  (Tr. 47.)  She explained that her feet swelled up and she had pain in her back, hips, feet, and back of her head.  (*Id*.)

On a typical day, Ms. Daykin reported she watched television, listened to music, and worked on latch hook.  (Tr. 54.)  She said she had to have the television turned up loud so she could hear it.  (*Id*.)  She also noted during her counsel's questioning that she was having a difficult time hearing him.  (Tr. 57-58.)  Later during her testimony, she stated:

> I cannot hear out of my right ear.  I had a tumor the size of a golf ball.  I was two or four years old.  I had that removed.  And then I had a second surgery again in 1999.  They removed a tumor . . . and then the infection.   And they put another eardrum in.  And I believe it was back by Thanksgiving, I can't remember exactly, my ear popped really bad.  I ended up going to the emergency room.  And they said there's a hole in the back of my eardrum, and they cut something out of my ear.  And they said, Dr. Baker . . . is going to be redoing my surgery on my ear again.  They did a hearing test on me.  I failed the hearing aid test.  And they're talking about implants, because I can't hear out of my right ear.  But I'm trying to hear out of my left one.  I'm losing hearing in my left ear, so I'm trying to make my left hearing stronger.  But I'm losing hearing in it.

(Tr. 63-64.)  She reported getting dizzy and hearing a "horrible" ringing or hissing sound in her ear.  (Tr. 64-65.)

Ms. Daykin testified regarding the polyp that was removed from her vocal cord on the right side but explained that there was "a major, bigger one in the middle of [her] throat" and there were polyps on the left side of her throat.  (Tr. 62.)  When asked whether she had difficulty talking or speaking, she stated: "My voice goes up and down.  It crackles.  But the thing of it is when I cough, I got to -- it's a horrible gasping, like I'm gasping for breath cough."  (*Id*.)  When asked whether she was limited as to how long or much she could talk or speak, she responded:

> I don't like talking because some people say they don't hear me.  But when I do talk, it's to family.  Any they tell me they can't hear me, but I try to speak to them.  And I hear in my own self.  Like my voice crackles.

13

(Tr. 62-63.)  She also stated: "My throat hurts when I talk a lot.  When I talk a lot.  I try not to."

(Tr. 63.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 66-72.)  For his first

hypothetical, the ALJ asked the VE to assume an individual who was Ms. Daykin's age and with

her education who was limited to light work with additional limitations of:

> Occasional left foot controls; frequent climbing of ramps and stairs; never to climb ladders, ropes, or scaffolds; occasional balance; frequently stoop; never could be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; occasional exposure to dust, odors, fumes, and pulmonary irritants; never to be exposed to vibration; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace, i.e., assembly line work; limited to simple work-related decisions in using her judgment in dealing with changes in the work setting; able to frequently interact with supervisors, coworkers, and the public.

(Tr. 66-67.)   The VE testified that there were jobs available that the hypothetical individual

could perform, including machine tender feeder, inspector, and light assembler, all light,

unskilled jobs.  (Tr. 68-69.)

For his second hypothetical, the ALJ asked the VE to assume an individual who was Ms.

Daykin's age and with her education who was limited to light work with the additional

limitations of:

> [O]ccasionally operate right and left foot controls; occasionally reach overhead with the right and the left; frequently reach in all other directions with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; able to work in a loud noise environment; never to be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle, or vibration; occasionally be exposed to dust, odors, fumes, and pulmonary irritants; frequently exposed to humidity and wetness, extreme cold and extreme heat; limited to performing simple, routine, and repetitive tasks and not at a production rate pace i.e. assembly line work; limited to simple work-related decisions and using her judgment in dealing with changes in the work setting; and able to frequently interact with supervisors, coworkers, and the public.

14

(Tr. 69-70.)  The VE testified that the jobs identified in response to the first hypothetical would also be available to the individual described in the second hypothetical.  (Tr. 70.)

For his third hypothetical, the ALJ asked the VE to assume the same limitations set forth in the second hypothetical except at the sedentary exertional level.  (Tr. 70.)  With that modification, the VE testified that the following jobs would be available: table worker, surveillance system monitor, and work order clerk.  (Tr. 70-71.)  For his fourth hypothetical, the ALJ asked the VE to consider the first three hypotheticals with the additional limitation of being off-task 20% of the time in addition to normal work breaks and/or absent from work two days per month.  (Tr. 71-72.)  The VE testified that the additional limitations would preclude competitive employment.  (Tr. 72.)   Ms. Daykin's counsel did not pose follow-up questions to the VE.  (*Id*.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy. *Id.*

## IV.   The ALJ's Decision

In his March 26, 2020 decision, the ALJ made the following findings:[1]

---

[1] The ALJ's findings are summarized.

1.    The claimant has not engaged in substantial gainful activity since February 21, 2019, the application date.  (Tr. 17.)

2.    The claimant has the following severe impairments: spondylosis at C6-7 with slight flattening of the thoracic cord and sacral tilt towards right with a compensatory levodextroconvex spinal asymmetry; degenerative changes of the right first metatarsophalangeal and calcaneovarus feet; asthma/chronic obstructive pulmonary disease; profound mixed hearing loss of the right ear and moderate sensorineural hearing loss in the left ear; vocal cord dysfunction/polyps; gastroesophageal reflux disease; depression; post-traumatic stress disorder; panic disorder; and borderline intellectual functioning.  (*Id*.)

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 17-19.)

4.    The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except the claimant can occasionally operate right and left foot controls; occasionally reach overhead with the right and the left; frequently reach in all other directions with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; able to work in a loud noise environment; never be exposed to unprotected heights, moving mechanical parts, operate a motor vehicle, or vibration; occasionally be exposed to dust, odors,  fumes, and pulmonary irritants; frequently be exposed to humidity and wetness, extreme cold, and extreme heat; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; and able to frequently interact with supervisors, coworkers, and the public.  (Tr. 20-28.)

5.    The claimant has no past relevant work.  (Tr. 28.)

6.    The claimant was born in 1966 and was 52 years old, defined as an individual closely approaching advanced age, on the date the application was filed.  (*Id*.)

7.    The claimant has a limited education and is able to communicate in English.  (*Id*.)

8.    Transferability of job skills is not an issue.  (*Id*.)

9.    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform, including machine tender/feeder, inspector, and assembler.  (Tr. 28-29.)

Based on the foregoing, the ALJ found Ms. Daykin had not been under a disability as defined in the Social Security Act from February 21, 2019, the date the application was filed.  (Tr. 29.)

## V.  Plaintiff's Arguments

Ms. Daykin argues that the Commissioner's final decision is not supported by substantial evidence because the hypothetical questions that the ALJ posed to the VE failed to account for limitations due to her speech and hearing loss impairments.  (ECF Doc. 12, ECF Doc. 14.)

## VI.  Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

18

(citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.     First Assignment of Error: Whether the ALJ Appropriately Accounted for Plaintiff's Speech-Related Impairment in the Hypothetical Questions and RFC

Ms. Daykin argues that the ALJ's decision is not supported by substantial evidence because the ALJ's hypothetical questions to the VE did not include limitations relating to her vocal impairment.  (ECF Doc. 12, pp. 8-9; ECF Doc. 14, pp. 1-4.)  The Commissioner argues in response that the ALJ discussed Ms. Daykin's "vocal cord issues at length," he accommodated her speech-related impairment in the RFC "by limiting [her] to only frequent interaction with

others," and that Ms. Daykin does not "cite to any opinion or medical evidence that supports
further limitations than what is in [the] residual functional capacity finding."  (ECF Doc. 13, p.
9.)  Further, the Commissioner argues that "none of the jobs cited by the vocational expert list
talking as a requirement in the DOT" (*id.* at p. 9), and "remanding to add an additional limitation
to Plaintiff's ability to speak would [therefore] be nothing more than a 'useless formality' that
would not change the ultimate outcome of the case (*id.* at p. 10).

 The ALJ concluded at Step Two that one of Ms. Daykin's severe impairments was "vocal
cord dysfunction/polyps."  (Tr. 17.)  The ALJ proceeded to assess Ms. Daykin's RFC and
limitations relating to her severe impairments based on the entirety of the record.  (Tr. 20-28.)
At the hearing, the ALJ posed several hypotheticals to the vocational expert.  (Tr. 66-72.)  Ms.
Daykin's counsel declined the opportunity to question the vocational expert.  (Tr. 72.)

 A claimant's "[r]esidual functional capacity is . . . the most [] [she] can still do despite the
physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.*,
342 F. App'x 149, 155 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)).  "In order
for a vocational expert's testimony in response to a hypothetical question to serve as substantial
evidence in support of the conclusion that a claimant can perform other work, the question must
accurately portray a claimant's physical and mental impairments."  *Parks v. Social Sec. Admin.*,
413 Fed. App'x 856, 865 (6th Cir. 2011) (quoting *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504,
516 (6th Cir. 2010)).  However, "[t]he rule that a hypothetical question must incorporate all of
the claimant's physical and mental limitations does not divest the ALJ of his or her obligation to
assess credibility and determine the facts."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425,
429 (6th Cir. 2007) (quoting *Redfield v. Comm'r of Soc. Sec.,* 366 F.Supp.2d 489, 497 (E.D.
Mich. 2005)).  Thus, "[i]n fashioning a hypothetical question to be posed to a vocational expert,

the ALJ is required to incorporate only those limitations that he accepts as credible." *Id.* (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)); *see also Parks*, 413 F. App'x at 865 ("Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible.") (citing *Casey*, 987 F.2d 1230 at 1235).

The ALJ considered Ms. Daykin's speech impairment when assessing the evidence and determining what RFC limitations he deemed appropriate.  The ALJ discussed the medical evidence in detail, including evidence relevant to Ms. Daykin's speech impairment.  (Tr. 20-26.)  Specific to her speech impairment, the ALJ discussed:

- November 18, 2018, examination findings which showed normal speech (Tr. 21, 280);

- November 26, 2018, office visit with Dr. Severt where Ms. Daykin reported voice change/hoarseness and was referred to an ENT (Tr. 21, 276);

- January 25, 2019, voice evaluation with SLP Philippbar, where significant bilateral vocal fold polyps were identified but voice therapy was not deemed warranted; Ms. Daykin was advised to return to the ENT clinic; and she was counseled about quitting smoking, hydration, and use of caffeine (Tr. 22, 267-68);

- February 8, 2019, appointment with Dr. Tucker where Ms. Daykin agreed to surgery to remove vocal cord polyps and was advised that the polyps would likely return if she continued smoking and that she would need a short course of speech therapy following surgery (Tr. 22, 261-62);

- March 1, 2019, vocal cord surgery (Tr. 22, 242-45);

- March 15, 2019, SLP Philippbar therapy session wherein five to eight therapy sessions were recommended to improve her voice quality and SLP Philippbar rated Ms. Daykin's prognosis as good (Tr. 22, 341-42);

- April 9, 2019, psychological consultative examination where Ms. Daykin's flow of conversation was satisfactory but she had a tendency to ramble although she had a difficult time talking (Tr. 23, 318-19);

- October 3, 2019, pharmacologic management appointment which reflected that Ms. Daykin's speech was spontaneous and normal (Tr. 24, 522);

- October 22, 2019, appointment with Dr. Ludlow in the ENT clinic where Ms. Daykin reported great improvement with her voice and was happy with how things were going;

she reported occasional raspiness and hoarseness but felt she was doing much better and had no other concerns; and Dr. Ludlow felt that she was doing great and no additional intervention was needed (Tr. 24-25, 528-29);

- January 2, 2020, pharmacologic management appointment which reflected that Ms. Daykin's speech was spontaneous and normal (Tr. 25, 561).

The ALJ then explained:

I find the objective medical evidence, clinical findings on examination, and course of treatment in this case are not consistent with disabling physical impairment or disabling pain and are more consistent with the stated residual functional capacity . . .

In addition, the claimant had polyps removed from her vocal cord "without complications," followed by a short course of speech therapy (see above) . . . While the claimant has received medical care on a regular basis, she has not required or received frequent medical care for any medical condition.  From all of this, I find that the claimant's symptoms and limitations are not as severe as alleged.

(Tr. 26.)  Thus, the ALJ did not ignore evidence relating to Ms. Daykin's speech impairment, but instead considered it and concluded based on the evidence that her vocal impairment was not as severe or as disabling as she alleged.

Moreover, contrary to Ms. Daykin's argument, the ALJ also included specific limitations relevant to Ms. Daykin's speech-related impairment in both his hypothetical questions and the RFC.  Specifically, he did not find she could engage in "constant" interactions with others during the workday, but instead limited her to "frequent" interaction with supervisors, coworkers, and the public.  (Tr. 20.)  Thus, having considered the evidence relating to Ms. Daykin's speech-related impairment, the ALJ found that the most she could interact with others was one-third to two-thirds of the workday.  *See* SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24, 1983 WL 31251, *6 (Jan. 1, 1983) ("'Frequent' means occurring from one-third to two-thirds of the time.").

The ALJ was not required to accept Ms. Daykin's subjective complaints in forming his hypothetical questions to the vocational expert.  *See Griffeth*, 217 F. App'x at 429.  Instead, he

was "required to incorporate only those limitations that he accept[ed] as credible." *Id.*  In this case, the ALJ explained why he did not find Ms. Daykin's subjective allegations entirely credible and still adopted an RFC that limited the amount of time she would be required to speak during the workday.  While Ms. Daykin contends that a limitation to frequent interaction is "antithetical to a limitation in speech" (ECF Doc. 12, pp. 8-9), she is ultimately arguing that the record supports greater limitations than those imposed by the ALJ.  However, "'[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen*, 800 F.2d at 545).  That means this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ," regardless of whether substantial evidence – or even a preponderance of evidence – supports Ms. Daykin's more restrictive reading of the evidence.  *Jones*, 336 F.3d at 477; *see also Blakley*, 581 F.3d at 406.

 Here, the record reflects that the ALJ considered the evidence relevant to Ms. Daykin's speech-related impairment and assigned related limitations in the RFC.  That evidence included Ms. Daykin's own reports of "great improvement in her voice" in October 2019, approximately six months following her vocal cord surgery, and her physician's assessment that she was "doing great" and "no additional intervention [was] needed." (Tr. 22, 242-45, 528-29.)  Based on a review of the record as a whole, the undersigned finds there was substantial evidence to support the specific speech-related limitations that the ALJ articulated to the VE and adopted in the RFC.

For the reasons explained above, the Court finds the ALJ properly considered the evidence relating to Ms. Daykin's speech-related impairment and appropriately accounted for that impairment in both the hypothetical questions to the VE and the RFC limitations.  The ALJ determined that Ms. Daykin could interact with others no more than frequently, or one-third to

two-thirds of the time, during a workday (Tr. 20), and included that limitation in his hypothetical questions to the VE (Tr. 69-70).  Accordingly, the Court finds the VE testimony upon which the ALJ relied serves as substantial evidence in support of his Step Five determination.[2]

**C.      Second Assignment of Error: Whether the ALJ Appropriately Accounted for Plaintiff's Hearing Impairment in the Hypothetical Questions and RFC**

Ms. Daykin also argues that the ALJ's decision is not supported by substantial evidence because he did not include limitations in the VE hypothetical questions relevant to her hearing impairment.  (ECF Doc. 12, pp. 9-10, ECF Doc. 14, pp. 4-5.)  The Commissioner responds that "the ALJ discussed the relevant evidence regarding Plaintiff's hearing loss and accommodated this impairment in his residual functional capacity assessment."  (ECF Doc. 13, pp. 11-14.)  Additionally, the Commissioner asserts that the jobs identified by the vocational expert as described in the DOT do not require hearing.  (*Id*. at pp. 11-12.)

The ALJ concluded at Step Two that one of Ms. Daykin's severe impairments was "profound mixed hearing loss of the right ear and moderate sensorineural hearing loss in the left ear."  (Tr. 17.)  The ALJ then proceeded to assess Ms. Daykin's RFC and limitations relating to her severe impairments based on the entirety of the record.  (Tr. 20-28.)  The ALJ posed several hypotheticals to the vocational expert at the hearing, but Ms. Daykin's counsel declined the opportunity to question the vocational expert.  (Tr. 66-72.)

As noted above, a claimant's "[r]esidual functional capacity is . . . the most . . . [she] can still do despite the physical and mental limitations resulting from her impairments," *Poe*, 342 F. App'x at 155, and an ALJ need only incorporate "those limitations that he accepts as credible" in articulating hypothetical questions to the VE, *Griffeth*, 217 F. App'x at 429.  As he did with Ms.

---

[2] In light of this finding, the Court finds it unnecessary to address the Commissioner's contention that there was no error because the jobs identified by the vocational expert as described in the DOT do not require talking.

Daykin's speech-related impairment, the ALJ in this case did consider Ms. Daykin's hearing impairment when assessing the evidence and determining what RFC limitations he deemed appropriate.  Specifically, the ALJ considered consultative examiner Dr. Schefft's May 23, 2019 observation that her hearing appeared "to be adequate for normal conversation."  (Tr. 24, 395.) He also discussed evidence relating to her treatment for her hearing loss, explaining:

> On January 16, 2020, the claimant saw Nilam Patel, M.D., at the ENT Clinic, for new onset right ear pain. The claimant reported about a week ago she felt a popping sensation in her right ear and since then had been having a continuous "hissing" sound from that ear. She also complained of tenderness around her ear, intermittent vertigo that started after this episode, and headache. On examination, the claimant had a small area of impacted cerumen within the mastoid cavity possibly leading to her current symptomology. An audiogram showed mixed hearing loss in the right ear with a profound conductive component and mild-moderate sensorineural hearing loss in the left ear. Dr. Patel prescribed ear drops and discussed the possibility of hearing amplification with the claimant on a later visit after resolution of her acute complaint (7F/54-56).

> On January 16, 2020, Madeline Merkord, Au.D., CCC-A, thought the claimant may benefit from hearing aids pending otologic clearance (7F/61).

> ***

> On February 6, 20[20], the claimant followed up with Dr. Patel. Dr. Patel removed the cerumen and on examination, the full cavity looked healthy with no trauma or drainage (7F/98-99).

(Tr. 25.)  The ALJ then explained:

> I find that the objective medical evidence, clinical findings on examination, and course of treatment in this case are not consistent with disabling physical impairment or disabling pain and are more consistent with the stated residual functional capacity . . .

> She has bilateral hearing loss, but Dr. Schefft noted that the claimant's hearing appeared to be adequate for normal conversation (see above); she was able to participate in her hearing by telephone; and she may benefit from hearing aids . . . While the claimant has received medical care on a regular basis, she has not required or received frequent medical care for any medical condition.  From all of this, I find that the claimant's symptoms and limitations are not as severe as alleged.

(Tr. 26.)  Thus, the ALJ did not ignore evidence relating to Ms. Daykin's hearing impairment, but instead considered it and concluded based on the evidence that her hearing impairment was not as severe or as disabling as she alleged.

Moreover, contrary to Ms. Daykin's argument, the ALJ included specific limitations relevant to Ms. Daykin's hearing impairment in both his hypothetical questions and the RFC. Specifically, he did not find that she could engage in "constant" interactions during the workday, or that she could work in an environment with "very loud" noise levels.  Instead, he adopted an RFC that limited Ms. Daykin to "frequent" interaction with others and found she could perform work in a "loud" noise environment.  (Tr. 20, 69-70.)  Thus, having considered the evidence relating to Ms. Daykin's hearing impairment, the ALJ found she could interact with others no more than one-third to two-thirds of the workday and that she must be restricted to work environments with "loud" noise levels or less.

Appendix D to the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupations Titles* ("SCODICOT") identifies five noise intensity levels to which a worker might be exposed to in a job environment, ranging from very quiet to very loud.  The following examples are provided in Appendix D:

| CODE | LEVEL | ILUSTRATIVE EXAMPLES |
|------|-------|----------------------|
| 1 | Very Quiet | isolation booth for hearing test; deep sea diving; forest trail |
| 2 | Quiet | library; many private offices; funeral reception; golf course; art museum |
| 3 | Moderate | business office where type-writers are used; department store; grocery store; light traffic; fast food restaurant at off-hours |
| 4 | Loud | can manufacturing department; large earth-moving equipment; heavy traffic |
| 5 | Very Loud | rock concert - front row; jack-hammer in operation; rocket engine testing area during test |

26

As discussed above, the ALJ was not required to accept Ms. Daykin's subjective complaints as true in forming his hypothetical questions to the VE, and was instead "required to incorporate only those limitations that he accept[ed] as credible. *See Griffeth*, 217 F. App'x at 429. Here, the ALJ explained why he did not find Ms. Daykin's subjective complaints entirely credible and then adopted an RFC that limited both the noise levels of her work environment and the amount of time she would need to spend communicating with others during the workday.

Ms. Daykin argues: "It is evident that a person with hearing impairment, coupled with a speech impairment, both of which the ALJ has found to cause more than a minimal effect on Plaintiff's ability to work, would necessarily affect a person ability to work in a loud noise environment with frequent interaction with others." (ECF Doc. 12, p. 10.) Here, she is again arguing that the record supports greater limitations than those imposed by the ALJ. Because the standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts,'" *Blakley*, 581 F.3d at 406, this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ," regardless of whether substantial evidence – or even a preponderance of evidence – supports Ms. Daykin's contrary reading of the evidence. *Jones*, 336 F.3d at 477.

The undersigned notes that Ms. Daykin clarified in her reply brief that she is not arguing that the ALJ's "treatment of [her] hearing loss in formulating the RFC" lacked the support of substantial evidence. (ECF Doc. 14, p. 4.) Instead, she asserts her argument is that the VE's testimony could not serve as substantial evidence in support of the ALJ's decision because the ALJ "fail[ed] to include any limitation relating to hearing in the hypotheticals posed to the VE[.]" (*Id.* at pp. 4-5.) This argument must fail. As discussed above, the ALJ did in fact include environmental and interaction limitations relevant to her hearing impairment in both the

VE hypothetical and the RFC.  The ALJ imposed relevant limitations in the RFC.  Ms. Daykin is simply arguing that those limitations were not enough to adequately address her impairments.

Even if Ms. Daykin had not disclaimed her argument that the RFC lacks the support of substantial evidence, the undersigned finds that the record contains substantial evidence to support the ALJ's finding that the RFC limitations adopted were sufficient to account for Ms. Daykin's hearing impairment.  As discussed above, the record was not suggestive of functional hearing limitations until a new onset of ear pain and a related audiogram on January 16, 2020.  (Tr. 25 (citing Tr. 567-69).)  After that acute event, Ms. Daykin's severely impacted cerumen was removed and hearing aids were recommended.  (*Id.* (citing Tr. 574, 611-12).)  Ms. Daykin has not identified, and the undersigned in unaware of, any record evidence documenting her hearing capacity after the February 2020 cerumen removal or with the assistance of hearing aids.  Moreover, contrary to Ms. Daykin's argument, a limitation to a loud noise environment is not inherently inconsistent with the ALJ's finding that she had a severe hearing impairment.  As explained in Social Security Ruling 85-15:

> [H]earing impairments do not necessarily prevent communication, and differences in types of work may be compatible with various degrees of hearing loss.  Occupations involving loud noise . . . have traditionally attracted persons with hearing impairments, whereas individuals with normal hearing have to wear ear protectors to be able to tolerate the working conditions.

*See* SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. 343, 1985 WL 56857, at *7 (Jan. 1, 1985) (emphasis added).  Based on a review of the record as a whole, the undersigned finds there was substantial evidence to support the specific hearing-related limitations that the ALJ articulated to the VE and adopted in the RFC

For the reasons explained above, the Court finds the ALJ properly considered the evidence relating to Ms. Daykin's hearing impairment and appropriately accounted for that

impairment in both the hypothetical questions to the VE and the RFC limitations. The ALJ found Ms. Daykin could interact "frequently" with others and could work in environments with up to "loud" noise levels (Tr. 20), and included those limitations in his hypothetical questions to the VE (Tr. 69-70). Accordingly, the Court finds the VE testimony upon which the ALJ relied serves as substantial evidence in support of his Step Five determination.[3]

### VII. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

March 3, 2023

*/s/ Amanda M. Knapp*

AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

---

[3] In light of this finding, the Court finds it unnecessary to address the Commissioner's contention that there was no error because the jobs identified by the vocational expert as described in the DOT do not require hearing.

29